1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

WANDA LEE JENKINS-HAMPTON,   ) Case No. CV 13-6074-JPR
                              )
            Plaintiff,        )
                              )
       vs.                    ) **MEMORANDUM OPINION AND ORDER**
                              ) **REVERSING COMMISSIONER**
CAROLYN W. COLVIN, Acting     )
Commissioner of Social        )
Security,                     )
                              )
            Defendant.        )
_____ )

18   **I.   PROCEEDINGS**

19        Plaintiff seeks review of the Commissioner's final decision

20   denying her application for supplemental security income ("SSI").

21   The parties consented to the jurisdiction of the undersigned U.S.

22   Magistrate Judge under 28 U.S.C. § 636(c).  This matter is before

23   the Court on the parties' Joint Stipulation, filed June 19, 2014,

24   which the Court has taken under submission without oral argument.

25   For the reasons discussed below, the Commissioner's decision is

26   reversed and this action is remanded for further proceedings.

27
28

**II.   BACKGROUND**

Plaintiff was born on March 7, 1956.  (Administrative Record ("AR") 171.)  She attended two years of nursing school (AR 305) and worked briefly as a baggage clerk at a supermarket, a cashier at Rite Aid, and a clerk at Walmart (AR 211).

On July 9, 2009, Plaintiff filed an application for SSI, alleging that she had been unable to work since May 15, 2007, because of diabetes, high blood pressure, and anxiety.  (AR 107-08, 171-73, 189.)  After her application was denied, she requested a hearing before an Administrative Law Judge.  (AR 124.)  A hearing was held by videoconference on November 8, 2011.[1]  (AR 70-106.)  Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (Id.)  In a written decision issued December 15, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 23-35.)  On June 27, 2013, the Appeals Council denied Plaintiff's request for review.  (AR 1-3.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.

---

[1]The hearing was initially scheduled for February 15, 2011, but Plaintiff's counsel appeared that day to report that Plaintiff was unable to attend because she "physically is not capable of traveling" from her home in Long Beach to the hearing in Los Angeles.  (AR 67.)  The ALJ therefore continued the hearing so that Plaintiff could appear by videoconference from the agency's Long Beach office.  (AR 67-68.)

<u>Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance. <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

## IV.   THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A.   The Five-Step Evaluation Process

An ALJ follows a five-step sequential evaluation process to assess whether someone is disabled.  20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must

3

determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. § 416.920(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, she is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner bears

---

[2]RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  § 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis. § 416.920; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since July 9, 2009, her application date.[3]  (AR 25.)  At step two, she found that Plaintiff had the severe impairments of "obesity and diabetes mellitus."  (<u>Id.</u>)  She found that Plaintiff's hypertension, depression, and anxiety were not severe.  (AR 27-29.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 29.) At step four, the ALJ found that Plaintiff had the RFC to perform "medium work" but "must avoid concentrated exposure to unprotected heights or hazardous machinery."[4]  (AR 29.)  The ALJ then concluded that under Medical-Vocational Rules 203.14 and 203.21, <u>see</u> 20 C.F.R. pt. 404, subpt. P, app. 2, Rs. 203.14 &

---

[3]The ALJ assessed whether Plaintiff had been under a disability on or after her application date rather than her alleged onset date.  (AR 25, 35.)  It is not clear whether Plaintiff amended her onset date to her application date at the hearing.  (<u>See</u> AR 75.)  But even if she did not, the ALJ's use of the application date could not have prejudiced Plaintiff because the earliest month in which she could have received SSI benefits was the month following the month in which she filed her application.  <u>See</u> § 416.335.

[4]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  § 416.967(c).

5

1  203.21, Plaintiff was not disabled.  (AR 34-35.)

2  **V.  DISCUSSION**

3      Plaintiff contends that the ALJ erred in (1) failing to
4  include any mental limitations in her RFC; (2) rejecting the
5  opinions of her treating physician, Dr. Stanley Golanty; (3)
6  discounting her credibility; and (4) evaluating her obesity.[5]
7  (J. Stip. at 3.)

8      A.   The ALJ Erred in Assessing Plaintiff's Mental
9           Limitations

10     Plaintiff contends that the ALJ erred by "misinterpret[ing]"
11 the medical record and failing to include in her RFC a limitation
12 to "simple repetitive tasks."  (J. Stip. at 20.)  For the reasons
13 discussed below, the Court finds that remand is appropriate.

14          1.   Applicable law

15     "RFC is an administrative assessment of the extent to which
16 an individual's medically determinable impairment(s), including
17 any related symptoms, such as pain, may cause physical or mental
18 limitations or restrictions that may affect [her] capacity to do
19 work-related physical and mental activities."  SSR 96-8p, 1996 WL
20 374184, at *2 (July 2, 1996).  A district court must uphold an
21 ALJ's RFC assessment when the ALJ has applied the proper legal
22 standard and substantial evidence in the record as a whole
23 supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217
24 (9th Cir. 2005).  The ALJ must consider all the medical evidence
25 in the record and "explain in [his] decision the weight given to

26

27

28     [5]The Court addresses the disputed issues in an order
   different from that followed by the parties.

6

. . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. § 416.927(e)(2)(ii); see also § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); SSR 96-8p, 1996 WL 374184, at *2 (RFC must be "based on all of the relevant evidence in the case record").

In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints. See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC evidence from treating-physician opinions that were "permissibly discounted"). Moreover, the ALJ must consider limitations imposed by all of the claimant's medically determinable impairments, even those that are not severe. § 416.945(a)(2).

### 2.   Background

On October 7, 2009, Dr. Nathan E. Lavid, a board-certified psychiatrist, performed a complete psychiatric evaluation of Plaintiff at the agency's request. (AR 304-07.) He found that Plaintiff complained of panic attacks and took the medication Ativan,[6] which she said was helpful. (AR 304.) Plaintiff was

---

[6]Ativan, or lorazepam, is a benzodiazepine used to relieve anxiety. Lorazepam, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html (last updated Oct. 1,

well dressed, had good hygiene, a normal gait, and a full range of affect.  (AR 304, 306.)  Her thought processes were goal directed and she was able to recall three items immediately and one item after five minutes.  (AR 306.)  Dr. Lavid noted that Plaintiff was "unable to perform serial 3s accurately, but was able to concentrate throughout the evaluation."  (Id.)  He diagnosed "Panic Disorder vs. Anxiety Disorder."  (Id.)  Under "functional assessment," Dr. Lavid noted that the examination "revealed no evidence of cognitive deficits, perceptual disturbances or delusional disorders" and that Plaintiff was able to "focus her attention adequately," "follow 1- and 2-part instructions," and "adequately remember and complete simple tasks."  (AR 307.)  Dr. Lavid found that "[c]onsidering that [Plaintiff] reports a partial response to treatment and performed reasonably well during the mental status examination today, I believe that in her current mental state, she does have the ability to tolerate the stress inherent in the work environment, maintain regular attendance, and work without supervision."  (Id.)

On October 28, 2009, Dr. L.O. Mallare, a psychiatrist,[7] reviewed Plaintiff's medical records and completed psychiatric-review-technique and mental-RFC forms.  (AR 313-26.)  In the PRT

---

2010).

[7]Dr. Mallare's electronic signature includes a medical specialty code of 37, indicating psychiatry.  (AR 313); see Program Operations Manual System ("POMS") DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms. nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

form, Dr. Mallare opined that Plaintiff suffered from an anxiety disorder that resulted in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (AR 317, 321.) He noted that Plaintiff was able to perform "SRT," or simple repetitive tasks. (AR 323.) In the mental-RFC form, Dr. Mallare found that Plaintiff was "moderately limited" in her ability to understand, remember, and carry out detailed instructions but was not significantly limited in any other area, including her ability to understand, remember, and carry out very short and simple instructions. (AR 324-35.) He found that Plaintiff had "adequate mental function to perform 1-2 step instr[uctions]," was able to "interact appropriately w[ith] others," and could "adapt to simple changes in the work-place." (AR 326.) On December 29, 2009, Dr. P.M. Balson, also a psychiatrist,[8] reviewed Plaintiff's medical records and affirmed Dr. Mallare's findings. (AR 330-31.)

>           3.  Analysis

The ALJ concluded that Plaintiff's depression and anxiety "d[id] not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities" and were therefore "nonsevere." (AR 28.) In doing so, the ALJ summarized Dr. Lavid's opinion as finding that Plaintiff was "able to perform simple and complex tasks, maintain regular work attendance, work without supervision, and tolerate normal work

---

[8]Like Dr. Mallare, Dr. Balson's signature included a medical specialty code of 37, indicating psychiatry. (AR 331.)

environment stress." (AR 27.) The ALJ concluded that Dr. Lavid "effectively found [Plaintiff] to have no mental impediments to functioning in a work environment" and that Drs. Mallare and Balson found "no more than, at most, mild deficits." (AR 28.) The ALJ, moreover, "reject[ed]" Dr. Mallare's finding on the mental-RFC form that Plaintiff's ability to perform "complex tasks" was moderately limited, finding it inconsistent with "the other medical evidence of record," Dr. Lavid's "clinical findings," Plaintiff's "statements regarding her mental ability to perform daily living tasks to Dr. Lavid," and Dr. Mallare's finding in the PRT form that Plaintiff had "no more than 'mild' deficit in all areas of mental functioning." (Id.)

     The ALJ's finding that Plaintiff's mental impairment resulted in no functional limitations must be reversed because it is based on a mischaracterization of Dr. Lavid's opinion and is unsupported by substantial evidence. Contrary to the ALJ's observation, Dr. Lavid never opined that Plaintiff could perform "complex tasks" or indicated that she "effectively" had no impediment to maintaining employment. (See AR 27-28.) Rather, Dr. Lavid's "functional assessment" was that Plaintiff could follow "1- and 2-part instructions" and adequately remember and complete "simple tasks." (AR 307 (emphasis added).) By the same token, the ALJ erred in rejecting Dr. Mallare's opinion as inconsistent with Dr. Lavid's findings and the record evidence, because in fact the three physicians who rendered opinions regarding Plaintiff's mental functioning – Drs. Lavid, Mallare, and Balson – all agreed that she should be limited to performing some form of simple work. (See AR 307, 323, 326, 331.)

The ALJ also mistakenly rejected Dr. Mallare's findings based on Plaintiff's statements to Dr. Lavid "regarding her mental ability to perform daily living tasks." (See AR 28.) Plaintiff reported to Dr. Lavid that she was able to go on errands, dress and bathe herself, attend church, and visit her daughter and granddaughter. (AR 306.)   None of those activities appear to involve complex tasks or detailed instructions.   As such, they are not inconsistent with Dr. Mallare's opinion.

Finally, the ALJ points to the supposed conflict between Dr. Mallare's finding in the PRT form that Plaintiff had only "mild" deficits in all areas of functioning (AR 321) and his finding in the mental-RFC assessment that she had "moderate" limitations in understanding, remembering, and carrying out detailed instructions (AR 324-25).   (AR 28.)   But those findings do not necessarily conflict given that the language used in the two check-off forms does not correspond: in the PRT form, the "degree[s] of limitation" were listed as "none," "mild," "moderate," "marked," and "extreme" (AR 321), whereas in the mental-RFC form, the degrees of limitation were listed as "not significantly limited," "moderately limited," and "markedly limited"[9] (AR 324-25).   Moreover, in the mental-RFC assessment, Dr. Mallare found that Plaintiff was moderately limited only in understanding, remembering, and carrying out detailed instructions and was not significantly limited in the other 18 categories, which does not appear to be inconsistent with the PRT

_____

[9]The mental-RFC form also included places for indicating "no evidence of limitation in this category" and "not ratable on available evidence."   (AR 324-25.)

11

form's overall finding of only mild limitations. (Compare AR
324-25 with AR 321.) And in any event, in the PRT form, Dr.
Mallare explicitly referred to his findings in the mental-RFC
assessment and stated, consistent with his opinion in that
document, that Plaintiff was "capable of SRT," or simple
repetitive tasks. (AR 323.) As such, his findings in the two
forms do not appear to be inconsistent.

Because the ALJ erred in rejecting the doctors' findings
that Plaintiff was limited to simple tasks, that portion of her
decision must be reversed.

### 4. Remand for further proceedings is appropriate

When, as here, the ALJ improperly discredited medical-
opinion evidence, the Court generally has discretion to remand
for further proceedings. See Harman v. Apfel, 211 F.3d 1172,
1175-78 (9th Cir. 2000). When no useful purpose would be served
by further administrative proceedings, however, or when the
record has been fully developed, it is appropriate under the
"credit-as-true" rule to direct an immediate award of benefits.
Id. at 1179 (noting that "the decision of whether to remand for
further proceedings turns upon the likely utility of such
proceedings"); see also Garrison v. Colvin, 759 F.3d 995, 1020
(9th Cir. 2014) (noting that credit-as-true rule applies to
medical opinion evidence).

Under the credit-as-true framework, three circumstances must
be present before the Court may remand to the ALJ with
instructions to award benefits: "(1) the record has been fully
developed and further administrative proceedings would serve no
useful purpose; (2) the ALJ has failed to provide legally

sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison, 759 F.3d 1020.  When, however, the ALJ's findings are so "insufficient" that the Court cannot determine whether the rejected testimony should be credited as true, the Court has "some flexibility" in applying the credit-as-true rule.  Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003); see also Garrison, 759 F.3d at 1020 (noting that Connett established that credit-as-true rule may not be dispositive in all cases).  This flexibility should be exercised "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." Garrison, 759 F.3d at 1021.

Plaintiff argues that if her RFC included a limitation to simple repetitive tasks, she would be found disabled based on the VE's testimony in response to one of the ALJ's hypotheticals. (J. Stip. at 22; see also AR 99-100.)  As a factual matter, however, Plaintiff's argument fails.  The ALJ found that Plaintiff had the RFC to perform essentially a full range of medium work.  (AR 29.)  The ALJ's hypothetical to the VE, however, included a limitation to standing and walking only two hours in an eight-hour day (see AR 99-100), whereas medium work generally requires standing and walking six hours in an eight-hour day, see SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983) ("full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday")

and light work requires "a good deal of walking or standing" and generally more than the two hours required by sedentary work, id. at *5.  Thus, the VE's testimony does not establish that Plaintiff would be unable to perform any light- or medium-exertion work if she were limited to performing only simple tasks.  Accordingly, the third of the three requirements for a remand for benefits has not been met.  Moreover, because further VE testimony is needed to determine whether sufficient jobs exist that Plaintiff can perform, the first of the three requirements has not been met, either.

Remand is appropriate so that the ALJ can reconsider Plaintiff's RFC in light of her apparent limitation to "simple tasks" with one- to two-step instructions (see AR 307, 323, 326, 331) and elicit appropriate VE testimony regarding whether sufficient jobs exist that Plaintiff can perform given her physical and mental limitations.  Because the parties' other contested issues will not necessarily be reassessed as part of those proceedings on remand, the Court addresses each of them below and finds that none warrant reversal.

B.   The ALJ Properly Considered the Treating Physician's Opinion

Plaintiff contends that the ALJ committed reversible error in not affording controlling weight to Plaintiff's treating physician, Dr. Golanty.  (J. Stip. at 4.)

1.   Applicable law

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those

14

who did not treat or examine the plaintiff.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than that of an examining physician, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  § 416.927(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  § 416.927(c)(2)-(6).

When a treating or examining doctor's opinion is not contradicted by some evidence in the record, it may be rejected only for "clear and convincing" reasons.  <u>See</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81 F.3d at 830-31).  When a treating or examining physician's opinion is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.  <u>Id.</u>  The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.

§ 416.927(c)(3)-(6).

      2.  <u>Relevant facts</u>

     On September 30, 2009, Dr. Concepcion A. Enriquez, who was board eligible in internal medicine, completed an internal medical consultation at the agency's request.  (AR 300-03.)  Dr. Enriquez found that Plaintiff was 63.5 inches tall and weighed 225 pounds.  (AR 301.)  She was able to generate 25 pounds of force using the right hand and 45 pounds of force with her left, dominant hand.  (<u>Id.</u>)  Her cervical and lumbar spine had normal ranges of motion, no tenderness, and no spasm.  (AR 301-02.)  She had normal ranges of motion in her upper and lower extremities, normal muscle tone and bulk, and "5/5" strength throughout.  (AR 302.)  Her sensation was "intact to pinprick and light touch." (<u>Id.</u>)  Plaintiff's gait and balance were normal, and she did not need an assistive device to walk.  (AR 302-03.)  Dr. Enriquez noted that Plaintiff "has symptoms of diabetic neuropathy, including numbness on her hands and feet," but on examination her "[m]otor, sensory, and reflexes are all intact," she could "do fine and gross manipulation using her fingers with no problem," and her gait and balance were normal.  (AR 303.)

     Dr. Enriquez diagnosed history of high blood pressure and diabetes.  (AR 302.)  She opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk with normal breaks for six hours in an eight-hour day, and sit for six hours in an eight-hour day, and she must avoid unprotected heights and operating dangerous machinery.  (AR 303.)

     On October 22, 2009, Dr. P.N. Ligot, who specialized in

16

internal medicine,[10] reviewed Plaintiff's medical records and completed a physical-RFC-assessment form.  (AR 308-12.)  Dr. Ligot listed Plaintiff's diagnoses as diabetes mellitus, hypertension, and morbid obesity.  (AR 308.)  He believed Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk about six hours in an eight-hour day, sit about six hours in an eight-hour day, and perform unlimited pushing and pulling; he also believed she must avoid "concentrated exposure" to hazards such as machinery and heights.  (AR 309-11.)  On December 24, 2009, Dr. Myung Sohn, who also specialized in internal medicine,[11] reviewed Plaintiff's medical evidence and affirmed Dr. Ligot's assessment.  (AR 329.)

On February 1, 2011, Plaintiff's treating physician, Dr. Golanty, completed a medical-statement form and physical-RFC questionnaire.  (AR 335-40.)  In the medical-statement form, Dr. Golanty checked that Plaintiff suffered from type II diabetes, "[i]nsulin resistance," neuropathy, and nephropathy; he wrote "hands/feet" next to "nephropathy" on the form.[12]  (AR 335.)  Dr.

---

[10]Dr. Ligot's electronic signature includes a medical specialty code of 19, indicating internal medicine.  (AR 312); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms. nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

[11]Dr. Sohn's electronic signature also listed a medical specialty code of 19, indicating internal medicine.  (AR 329.)

[12]Diabetic nephropathy is kidney disease or damage that occurs in people with diabetes.  Diabetes and kidney disease, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/ 000494.htm (last updated Sept. 8, 2014).  It is unclear why Dr. Golanty wrote "hands/feet" next to this entry on the form.

17

Golanty opined that Plaintiff could work zero hours a day, stand 15 minutes at a time, sit 60 minutes at a time, occasionally and frequently lift five pounds, and occasionally balance.  (Id.)  He wrote that her neuropathy prohibited standing for more than 15 mintues without a break to sit down.  (Id.)

In the physical-RFC questionnaire, Dr. Golanty listed Plaintiff's diagnoses as insulin-requiring diabetes mellitus type II.  (AR 336.)  He listed her symptoms as "parasthesias [sic],"[13] pain, and numbness of the hands and feet, and the "clinical findings and objective signs" as decreased sensation with "microfilament."  (Id.)  Dr. Golanty opined that Plaintiff could not walk a block without rest or severe pain, could sit 15 minutes and stand 15 minutes at a time, and could sit or stand each for less than two hours total in an eight-hour workday.  (AR 337-38.)  He believed Plaintiff needed to walk for 10 minutes every 10 minutes in an eight-hour workday and would need to take unscheduled breaks every 15 to 60 minutes.  (AR 338.)  Her legs would not need to be elevated while sitting.  (Id.)  Dr. Golanty checked that Plaintiff could "rarely" lift less than 10 pounds and above, and she could only "occasionally" look down or up, turn her head, or hold her head in a "static position."  (AR 338-39.)  She could rarely twist, stoop, or crouch and never climb

---

[13]"Parasthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body."  NINDS Parasthesia Info. Page, Nat'l Inst. Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/parasthesia/parasthesia.htm (last updated Feb. 14, 2014).  "The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching."  Id.

ladders or stairs.  (AR 339.)  Plaintiff had significant
limitations on her ability to perform "fingering."  (Id.)  Dr.
Golanty opined that Plaintiff's depression and anxiety affected
her physical condition, her pain would "constantly" interfere
with her ability to concentrate enough to perform simple work
tasks, and she was incapable of even "low stress" jobs.  (AR
337.)  He believed that she would miss more than four days of
work a month because of her impairments or treatment.  (AR 339.)
At the end of the form, Dr. Golanty wrote, "[t]he problem is
neuropathy + insulin issues for [diabetes] care" and "[t]his is
not ortho stuff!"  (Id.)

     After summarizing the record evidence, the ALJ found that
Plaintiff could perform "medium work" that did not involve
unprotected heights, hazardous conditions, or dangerous
equipment.  (AR 29.)  The ALJ found that her RFC was consistent
with the evidence and the findings of Drs. Enriquez, Ligot, and
Sohn.  (AR 34.)  The ALJ, moreover, considered Dr. Golanty's
opinion but gave several reasons for finding it not "persuasive
or controlling."  (AR 33.)

               3.   Analysis

     Contrary to Plaintiff's contention (J. Stip. at 4), the ALJ
was not obligated to accord "controlling weight" to Dr. Golanty's
opinion because she permissibly found that it was unsupported by
sufficient clinical evidence and inconsistent with the record.
See § 416.927(c)(2).  As discussed below, moreover, the ALJ was
entitled to discount Dr. Golanty's opinion for those reasons and
because it was based primarily on Plaintiff's discredited
subjective complaints.

1    The ALJ permissibly discounted Dr. Golanty's opinion because
2  his clinical findings and the record as a whole "fail to support
3  his highly restrictive functional assessment."  (AR 32); see
4  § 416.927(c)(4) (explaining that more weight should be afforded
5  to medical opinions that are consistent with the record as a
6  whole); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685,
7  692-93 (9th Cir. 2009) (contradiction between treating
8  physician's opinion and his treatment notes constitutes specific
9  and legitimate reason for rejecting opinion); Houghton v. Comm'r
10 Soc. Sec. Admin., 493 F. App'x 843, 845 (9th Cir. 2012) (holding
11 that ALJ's finding that doctors' opinions were "internally
12 inconsistent, unsupported by their own treatment records or
13 clinical findings, [and] inconsistent with the record as a whole"
14 constituted specific and legitimate bases for discounting them).
15 Indeed, Dr. Golanty found that Plaintiff was extremely limited by
16 her neuropathy and "insulin issues," but very few clinical
17 findings support his conclusion.  Physicians noted on a few
18 occasions that Plaintiff had decreased sensation in her
19 extremities (see, e.g., AR 266 (July 2009, noting decreased
20 sensation during foot exam), 341 (Feb. 2011, noting decreased
21 sensation in extremities bilaterally), 392 (Aug. 2011, noting
22 "some loss of protective sensation in both feet")), but as the
23 ALJ noted, the record is devoid of any objective
24 "electromyographic tests" confirming or showing the extent of
25 Plaintiff's "diminished sensation or nerve functioning" (AR 32).
26 Indeed, although one of Plaintiff's treating physicians
27 apparently ordered such tests (see AR 266 (writing "NCT/EMG,"
28 presumably, nerve-conduction test and electromyography, under "P"

for plan in treatment note)), the results are not in the record and nothing indicates that Plaintiff ever underwent them. Moreover, Dr. Enriquez examined Plaintiff in September 2009 and found that she had intact sensation and normal gait and balance (AR 302), and during an emergency-room visit for treatment of a cough in March 2009, Plaintiff was noted to have "5/5" motor strength throughout, intact cranial nerves, and a "steady gait" (AR 269).  Such findings do not support Dr. Golanty's opinion that Plaintiff suffered from debilitating limitations because of her peripheral neuropathy and "insulin issues."

As the ALJ found, moreover, Dr. Golanty's notes show that Plaintiff "has only complained intermittently over the years of tingling in her extremities, with large gaps in the record between such complaints." (AR 32.)  Indeed, Plaintiff was first noted to have diabetic neuropathy in March 2006, when she complained of "tingling" in her hands and feet. (AR 292.)  But although Plaintiff claims to have been disabled since May 15, 2007 (AR 171), her doctors did not again note her complaints of neuropathy symptoms until July 2009, when a physician in Dr. Golanty's office found that Plaintiff had decreased sensation in her feet and diagnosed neuropathy.[14]  (AR 266.)  Thereafter, physicians in Dr. Golanty's office noted Plaintiff's reports of neuropathy or related symptoms only in December 2009, May and

---

[14]Specifically, no neuropathy symptoms were noted on treatment records dated March (AR 291), May (AR 290), July (AR 288), September (AR 284), and December 2006 (AR 282); May (AR 280) and November 2007 (AR 277); March (AR 276), April (AR 274), August (AR 273), and November 2008 (AR 271); and March 2009 (AR 351-52).

October 2010, and February 2011.[15]   (See AR 341-42, 345, 348.)
The ALJ also correctly noted that nothing supported Dr. Golanty's
assertion that Plaintiff's medical condition would require
frequent absences from work, because her treatment records showed
"little more than routine medical care or treatment for
transitory issues, and do not reflect a pattern of flare ups or
frequent exacerbations of her diabetes or other medical issues."
(AR 32.)

The ALJ further found that Plaintiff did not have "any
orthopedic problems to account for Dr. Golanty's restrictions
regarding [her] ability to lift, carry, move her neck and engage
in postural movement." (Id.)   Indeed, Dr. Golanty listed
Plaintiff's symptoms as including only paresthesia, pain, and
numbness of the hands and feet (AR 336), none of which appear to
support his opinion that Plaintiff could, for example, only
occasionally look down, turn her head right or left, look up, and
hold her head in a static position; rarely twist, stoop, crouch,
and squat; and lift and carry only 5 pounds frequently and up to
50 pounds rarely (AR 335, 338-39).[16]   Dr. Golanty, moreover,
stated in his opinion that Plaintiff's "problem" was neuropathy

---

[15]In June 2010, Dr. Golanty noted that Plaintiff's blood
sugar was "ok" and did not mention any neuropathy symptoms or
diagnosis.  (AR 344.)

[16]Dr. Golanty's opinions in the medical-statement and
physical-RFC forms also conflict with each other.  For example,
he opined in the medical-statement form that Plaintiff could
occasionally and frequently lift only five pounds and could sit
for 60 minutes at a time (AR 335), but in the physical-RFC form
he checked that she could "rarely" lift and carry less than 10
pounds and above and could sit for only 15 minutes at a time (AR
337-38).

1    and "insulin issues," not "ortho stuff" (AR 339), and none of his
2    treatment notes reflect that Plaintiff suffered from reduced
3    ranges of motion or that her ability to make certain movements
4    was in any way limited (see generally AR 266-93, 341-53).  Dr.
5    Enriquez, moreover, examined Plaintiff and found that she had
6    normal ranges of motion of the cervical and lumbar spine and
7    upper and lower extremities, normal muscle tone and bulk, and
8    "5/5" strength throughout (AR 301-02), and an emergency-room
9    doctor similarly found that Plaintiff had "5/5" motor strength
10   (AR 269).  Indeed, Plaintiff never asserted that her impairments
11   affected her ability to lift, squat, bend, or kneel.  (See AR 200
12   (Plaintiff's function report).)  For all of these reasons, the
13   ALJ was entitled to discount Dr. Golanty's opinion that Plaintiff
14   suffered from debilitating physical limitations because it was
15   unsupported by his treatment notes and the record as a whole.
16        Plaintiff nevertheless argues that the ALJ's rejection of
17   Dr. Golanty's opinion was improper because she incorrectly found
18   that after March 2006, Plaintiff did not complain of neuropathy
19   symptoms again until October 2010 (AR 32), when in fact her
20   doctors noted such complaints beginning in July 2009 (see AR
21   266).  (J. Stip. at 5.)  But as discussed above, the ALJ
22   correctly noted "large gaps" between Plaintiff's complaints of
23   neuropathy.  Moreover, she correctly found that Dr. Golanty's
24   opinion was unsupported by his treatment notes and the other
25   record evidence.  As such, any error in the ALJ's summary of the
26   evidence was harmless.  See Stout v. Comm'r Soc. Sec. Admin., 454
27   F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant
28   mistakes harmless); see also Wright v. Comm'r of Soc. Sec., 386

F. App'x 105, 109 (3d Cir. 2010) (Tashima, J., sitting by designation) (ALJ's misstatements in written decision harmless error when regardless of them "ALJ gave an adequate explanation supported by substantial evidence in the record").

The ALJ also permissibly discounted Dr. Golanty's finding of extreme limitations because it appeared to be premised largely on Plaintiff's subjective complaints, which, as discussed in Section V.B below, the ALJ properly discredited. (See AR 32-33 (noting that Dr. Golanty "appears to have taken [Plaintiff's] subjective allegations at face value and merely reiterated those allegations in his report and when making his assertions regarding [Plaintiff's] ability to work"); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." (internal quotation marks omitted)); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when ALJ properly discounted claimant's credibility, he was "free to disregard" doctor's opinion that was premised on claimant's properly discounted subjective complaints). Indeed, as previously discussed, the treatment notes from Dr. Golanty's office reflect very few objective findings to support a diagnosis of peripheral neuropathy and instead reflect mostly Plaintiff's own report of her symptoms.[17]  And in his physical-RFC assessment, Dr. Golanty

---

[17]Specifically, in July 2009, a doctor conducted a foot examination and found that Plaintiff had decreased sensation (AR 266), and in February 2011, a doctor noted that Plaintiff had decreased sensation bilaterally in her extremities (AR 341).  The other notes seem merely to record Plaintiff's own report of her

listed only "decreased sensation" under "clinical findings and objective signs." (AR 336.) Thus, as the ALJ found, it appears that much of Dr. Golanty's opinion as to Plaintiff's limitations was based on her discredited subjective complaints, and the ALJ was therefore entitled to discredit his opinion.

The ALJ also found that Dr. Golanty's "general lack of medical treatment beyond medication, insulin and advised lifestyle changes fail [sic] to support his highly restrictive functional assessment."[18] (AR 32); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (holding that ALJ properly rejected opinion of treating physician who prescribed conservative treatment yet opined that claimant was disabled). Plaintiff does not contest that Dr. Golanty prescribed only medication, including insulin, and recommended that she improve her diet and exercise, but she argues that this was not a proper reason for discounting his opinion because "[f]ailing to pursue non-conservative treatment options is not substantial evidence where

_____

symptoms. In December 2009, Dr. Golanty noted "neuropathy" and Plaintiff's report that it "affects hands/feet," she "can't write," and she "can't stand." (AR 348.) In May 2010, Dr. Golanty noted "neuropathy" but did not record any symptoms or clinical findings related to that condition. (AR 345.) In June 2010, Dr. Golanty noted that Plaintiff's blood sugar was "ok" and did not mention any neuropathy symptoms or diagnosis. (AR 344.) And in October 2010, Plaintiff reported that she had been unable to afford insulin, had not taken it for "months at a time," and complained of "neuropathy in hands and feet," but Dr. Golanty did not record any clinical findings to support Plaintiff's complaints. (AR 342.)

[18]In any event, it appears that Plaintiff often failed to follow her prescribed treatment. (See, e.g., AR 280 (noting Plaintiff had not been taking insulin because of "stress"), 342 (noting "poor diet and exercise control" and that Plaintiff "states she knows she needs to improve diet + exercise").

none exists." (J. Stip. at 6 (citing <u>Lapeirre-Gutt v. Astrue</u>, 382 F. App'x 662, 664 (9th Cir. 2010) (holding that "[a] claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist").) But Dr. Golanty presumably could have provided other treatment, such as prescribing a cane, recommending further testing of her peripheral neuropathy, prescribing stronger pain medication, or referring her to a pain-management doctor or other specialist. In any event, even if the ALJ improperly relied on this finding in discounting Dr. Golanty's opinion, it was harmless because she gave other legally sufficient reasons for doing so. <u>See</u> <u>Stout</u>, 454 F.3d at 1055; <u>cf.</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (ALJ's reliance on erroneous reasons for adverse credibility determination harmless when substantial evidence supported determination and errors did not negate its validity).

Moreover, the ALJ was entitled to rely on the opinions of Drs. Enriquez, Ligot, and Sohn instead of Dr. Golanty's opinion because they were supported by independent clinical findings and thus constituted substantial evidence. <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1149; <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995). Before rendering her opinion, Dr. Enriquez performed an internal medical examination of Plaintiff, finding, for example, that Plaintiff had normal ranges of motion, intact sensation, normal muscle tone, 5/5 strength, and normal gait and balance. (AR 300-03.) Drs. Ligot's and Sohn's opinions, moreover, relied on Dr. Enriquez's and were consistent with it. (AR 312, 329); <u>see</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002) ("The

opinions of non-treating or non-examining physicians may also
serve as substantial evidence when the opinions are consistent
with independent clinical findings or other evidence in the
record."). Dr. Sohn, moreover, explicitly stated that he had
"reviewed all the evidence in the file" before affirming Dr.
Ligot's RFC finding. (AR 329); see § 416.927(c)(3) (in weighing
medical opinions, ALJ "will evaluate the degree to which these
opinions consider all of the pertinent evidence in [claimant's]
claim, including opinions of treating and other examining
sources"). Thus, any conflict in the properly supported medical-
opinion evidence was "solely the province of the ALJ to resolve."
Andrews, 53 F.3d at 1041.

    Finally, to the extent Plaintiff argues that Dr. Golanty's
opinion should have been credited over Dr. Enriquez's because he
is Board certified and Dr. Enriquez is only Board eligible (J.
Stip. at 6-7), that argument fails.[19] Dr. Enriquez did not need
to be Board certified to practice medicine in California, nor
does Plaintiff allege that her training was inadequate to permit
a thorough and valid examination. See Kladde v. Astrue, No. ED
CV 07-01439(SH), 2009 WL 838104, at *5 (C.D. Cal. Mar. 26, 2009)
(finding record supported ALJ's decision to give greater weight
to examining doctor when Plaintiff did not allege that his
Board-eligible status rendered him unable to conduct valid

_____

    [19] A physician becomes Board eligible upon completion of the
training necessary for Board certification in a given specialty.
See General Policies & Requirements, Am. Bd. of Internal Med.,
http://www.abim.org/certification/policies/general-policies-
requirements.aspx (last visited Sept. 18, 2014). Board
eligibility lasts seven years or until the physician passes the
examination for certification in a given specialty. Id.

1    assessment).

2         Reversal is not warranted on this ground.

3         C.   The ALJ Properly Discounted Plaintiff's Credibility

4         Plaintiff contends that the ALJ's adverse credibility

5    determination was not supported by substantial evidence.  (J.

6    Stip. at 12.)  Remand is not warranted on this ground, however,

7    because the ALJ provided clear and convincing reasons, supported

8    by substantial evidence, for discounting Plaintiff's credibility.

9              1.   Applicable law

10        An ALJ's assessment of symptom severity and claimant

11   credibility is entitled to "great weight."  See Weetman v.

12   Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

13   F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

14   believe every allegation of disabling pain, or else disability

15   benefits would be available for the asking, a result plainly

16   contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674

17   F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks

18   omitted).  In evaluating a claimant's subjective symptom

19   testimony, the ALJ engages in a two-step analysis.  See

20   Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must

21   determine whether the claimant has presented objective medical

22   evidence of an underlying impairment [that] could reasonably be

23   expected to produce the pain or other symptoms alleged."  Id. at

24   1036 (internal quotation marks omitted).  If such objective

25   medical evidence exists, the ALJ may not reject a claimant's

26   testimony "simply because there is no showing that the impairment

27   can reasonably produce the *degree* of symptom alleged."  Smolen,

28   80 F.3d at 1282 (emphasis in original).  When the ALJ finds a

                                   28

claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).

Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

### 2.   Relevant facts

In a July 2009 function report, Plaintiff stated that her daily activities included reading the Bible, talking on the phone with family members, spending time with her daughter, looking after her granddaughter, and watching "small amounts" of television.  (AR 195.)  She wrote that it took her almost 1.5 hours to perform personal care because of hand numbness.  (AR 196.)  She did not prepare meals or perform household chores. (AR 197.)  She went outside every day, but someone always had to be with her because of her "severe" panic attacks.  (AR 198.) Plaintiff asserted that she wore glasses "because of diabetes." (AR 199.)  She regularly went to church and her daughter's house. (Id.)  Plaintiff reported that she could stand for one hour or less, walk for 30 minutes or less, sit for one hour or less, use her hands for 20 minutes, concentrate for one hour, and "pay attention" for 30 minutes.  (AR 200.)  She could walk for 10 minutes before needing to rest for one hour.  (Id.)

In an undated disability report, Plaintiff reported that as of June 2009, she was able to use her hands only a few minutes at

29

a time, could not wear closed-toe shoes because of "pain [and] swelling," and had panic attacks that had worsened since the death of her stepmother. (AR 235, 240.) In a January 2010 disability report, Plaintiff stated that as of October 1, 2009, her hands and feet were numb "more often" and for "longer periods of time," she could not wear closed-toe shoes for long periods of time, and "some days writing [was] hard." (AR 251.)

At the November 8, 2011 hearing, Plaintiff testified that she could no longer work because of "bad pain" in her legs, feet, and fingers from neuropathy. (AR 81.) Plaintiff could no longer write and could not wear shoes for more than 20 minutes because of her condition. (Id.) She testified that she could walk from her chair to the bathroom or to get a glass of water before needing to sit for 15 to 20 minutes. (AR 82.) When caring for her granddaughter, she only had to warm food for her and see that she ate, and her granddaughter would just "sit with me the rest of the day until her mother gets there." (AR 83.) Plaintiff said she needed to elevate both feet "[m]ostly all day."[20] (AR 84.) She felt that her hammer toes and heel spurs contributed to her foot pain. (AR 92.) Plaintiff was unable to "keep [her] hands straight" or comb her hair because of hand pain. (AR 94.) She asserted that her depression also played a role in her disability. (AR 93-94.) She attended church every Saturday and during church was able to walk around, remove her shoes, and lie down. (AR 97.)

---

[20]Plaintiff's assertion conflicts with Dr. Golanty's finding that her legs would not need to be elevated with prolonged sitting. (AR 338.)

30

### 3. Analysis

The ALJ found that Plaintiff's conditions could reasonably be expected to cause her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with Plaintiff's RFC for medium work. (AR 30-31.) For the reasons discussed below, the ALJ permissibly discounted Plaintiff's subjective symptom testimony.

The ALJ noted that Plaintiff "has generally not participated in the work force in any significant manner and, since losing her last job, has not apparently made a significant effort to seek out new employment." (AR 33.) Indeed, Plaintiff's work-history report showed only a few brief periods of employment, even before she allegedly became disabled: she reported working as a childcare provider for friends and relatives "only when needed" from 1985 to 2000, a baggage clerk at a supermarket from May to July 2004, a cashier at Rite Aid from April to May 2006, and a clerk at Walmart from April to May 2007. (AR 211, 215.) She had not sought employment since leaving her job at Walmart. (AR 83.) Moreover, a Social Security earnings report shows that from 1985 to 2010, Plaintiff's only earnings were $1766 in 2004, $1009 in 2006, and $342 in 2007. (AR 176.) Her total lifetime reported earnings were $8174.[21] (Id.) In discounting Plaintiff's credibility, the ALJ was entitled to rely on Plaintiff's poor work history even before she allegedly became disabled. See

_____

[21]Plaintiff earned less than $500 in each of the years 1977, 1978, 1982, 1983, and 1984, and she earned only about $2300 in 1979 and $1300 in 1981. (AR 176.) She had no income in 1980. (Id.)

Thomas, 278 F.3d at 959 (ALJ permissibly discounted credibility when claimant "had an extremely poor work history and has shown little propensity to work in her lifetime" (internal quotation marks omitted)).

The ALJ also permissibly discounted Plaintiff's credibility based on her inconsistent statements regarding her limitations. The ALJ noted that Plaintiff asserted that she was "severely restricted in her ability to move about, perform even simple self care tasks, and perform household chores" (AR 33), but in October 2009, she told examining psychiatrist Lavid that she could go on errands, dress and bathe herself, attend church, and visit her daughter and granddaughter (AR 33, 306).  Plaintiff also claimed that she was unable to go out alone because of her panic attacks (AR 198) and that she could walk only from her chair to the bathroom or kitchen before needing to rest for 15 to 20 minutes (AR 82), but as the ALJ noted (AR 33), in February 2011, Plaintiff reported to her doctor that she had walked "unassisted" and alone from home to the medical clinic (AR 378).[22]  Such inconsistencies are a clear and convincing reason for discounting Plaintiff's credibility.  See Tommasetti, 533 F.3d at 1039 (holding that ALJ may consider many factors in weighing claimant's credibility, including "ordinary techniques of credibility evaluation, such as . . . inconsistent statements concerning the symptoms").

---

[22]Plaintiff asserts that the ALJ erred in relying on this fact because she did not develop the record as to how far Plaintiff lived from the doctor's office.  (J. Stip. at 13.)  But no matter how close it was, it was substantially farther than from the chair to the bathroom and thus undermined Plaintiff's credibility.

The ALJ also noted that Plaintiff testified that she had problems with prolonged sitting but was "able to apparently sit comfortably during the 80-minute hearing"; moreover, although Plaintiff reported difficulty concentrating, at the hearing her thoughts "did not seem to wander and all questions were answered alertly and appropriately." (AR 33.) The ALJ was permitted to rely on her observations of Plaintiff at the hearing as one of several factors affecting Plaintiff's credibility, given the inconsistencies between Plaintiff's claims and those observations. See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (ALJ's personal observations may be used in overall evaluation of credibility but cannot form "sole basis" for credibility determination); Thomas, 278 F.3d at 960 (ALJ properly relied on claimant's "demeanor at the hearing" in discounting credibility); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996) ("[T]he adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.").

Plaintiff argues, however, that "[g]iven the [videoconferenced] hearing and the technical difficulties, it remains unclear to what extent the ALJ was able to adequately observe [her] demeanor" at the hearing. (J. Stip. at 14.) It is true that the hearing was conducted by videoconference (at Plaintiff's request (see AR 67-69)) and that the parties experienced some lost connections or issues with the recording equipment (see AR 72, 75, 85-87), but those problems were all resolved and the hearing was successfully conducted and recorded (see AR 77-78, 88). Plaintiff's claim fails because nothing

1  indicates that the ALJ was unable to adequately observe Plaintiff

2  over the course of the lengthy hearing.  See McGovern v. Astrue,

3  No. 3:11-CV-05148-RBL, 2012 WL 966430, at *15 (W.D. Wash. Mar. 1,

4  2012) (rejecting as "mere[] speculation" plaintiff's argument

5  that ALJ was not able to notice plaintiff's discomfort because

6  "only video hearings were held"), accepted by 2012 WL 963737

7  (W.D. Wash. Mar. 21, 2012).

8      Finally, the ALJ rejected Plaintiff's testimony as

9  "generally unsupported by the medical evidence."  (AR 33.)

10 Indeed, although Plaintiff claimed to be significantly limited by

11 her neuropathy, examining physician Enriquez found that Plaintiff

12 had normal ranges of motion in her upper and lower extremities,

13 normal muscle tone and bulk, "5/5" strength throughout, intact

14 sensation, and normal gait and balance.  (AR 302-03.)  The ALJ

15 also noted that although Plaintiff claimed her diabetes affected

16 her vision (AR 199), Dr. Enriquez found that she "retained 20/30

17 bilateral uncorrected vision" (AR 32; see also 301), and

18 Plaintiff and her daughter both reported that she could read the

19 Bible (AR 32; see also AR 195, 203).  This, too, was a clear and

20 convincing reason for discounting Plaintiff's credibility.  See

21 Carmickle, 533 F.3d at 1161 ("Contradiction with the medical

22 record is a sufficient basis for rejecting the claimant's

23 subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in

24 determining credibility, ALJ may consider "whether the alleged

25 symptoms are consistent with the medical evidence"); see also

26 Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although

27 lack of medical evidence cannot form the sole basis for

28

34

1  discounting pain testimony, it is a factor that the ALJ can
2  consider in his credibility analysis.").

3      Because the ALJ's credibility determination is supported by
4  substantial evidence, this Court may not second-guess it.
5  Thomas, 278 F.3d at 959.  Reversal is not warranted on this
6  ground.

7      D.   The ALJ Properly Evaluated Plaintiff's Obesity
8      Plaintiff contends that the ALJ committed "reversible error"
9  by failing to "make any findings how or to what extent
10 [P]laintiff's obesity affected [her] functional limitations."
11 (J. Stip. at 19.)  For the reasons discussed below, Plaintiff's
12 argument fails.

13     As a general rule, an ALJ must determine the effect of a
14 claimant's obesity upon her other impairments and ability to
15 work.  Celaya v. Halter, 332 F.3d 1177, 1182 (9th Cir. 2003); see
16 also SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002) (requiring ALJ
17 to consider effects of obesity at several points in five-step
18 sequential evaluation).  An ALJ must "evaluate each case based on
19 the information in the case record," as obesity may or may not
20 increase the severity or functional limitations of other
21 impairments.  SSR 02-1p, 2002 WL 34686281, at *6.

22     Here, the ALJ fully considered Plaintiff's obesity when
23 formulating her RFC.  The ALJ noted Plaintiff's weights of 208,
24 225, and 228 pounds at various medical appointments (AR 25-26)
25 and concluded that her obesity was a severe impairment (AR 25).
26 And Dr. Ligot explicitly included in his physical-RFC assessment
27 a diagnosis of "Morbid Obesity (BMI 40)."  (AR 308.)  Plaintiff,
28 moreover, does not point to any limitations attributable to her

obesity that the ALJ ignored; instead, she cites to treatment notes in which her doctors simply recommended that she lose weight or exercise.  (J. Stip. at 20 (citing AR 280, 282, 341-42, 348).)  Indeed, Plaintiff's own treating physician, Dr. Golanty, failed even to list obesity among Plaintiff's diagnoses in his RFC opinions, nor did he attribute any of her alleged limitations to that condition.  (See AR 335-40.)  As such, the ALJ adequately considered Plaintiff's obesity in formulating her RFC.  See Burch, 400 F.3d at 684 (ALJ adequately considered obesity in RFC determination when he recognized obesity "likely contributed to [plaintiff's] back discomfort" and plaintiff "has not set forth, and there is no evidence in the record, of any functional limitations as a result of her obesity that the ALJ failed to consider"); Garcia v. Comm'r of Soc. Sec. Admin., 498 F. App'x 710, 712 (9th Cir. 2012) (ALJ adequately considered obesity by "recogniz[ing] [it] as a severe impairment" and "consider[ing] his obesity and rel[ying] on functional limits suggested by doctors who recognized it" when assessing RFC).

Plaintiff is not entitled to reversal on this ground.

**VI.   CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that (1) the decision of the Commissioner is REVERSED; (2) Plaintiff's request for remand is GRANTED; and (3) this action is REMANDED for further proceedings consistent with this Memorandum Opinion.

1   **IT IS FURTHER ORDERED** that the Clerk of the Court serve

2   copies of this Order and the Judgment herein on all parties or

3   their counsel.

4

5

6

7   DATED:September 30, 2014

8   _____
    JEAN ROSENBLUTH

9   U.S. Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37